W. E. Feess *et al.*, *Appellees*, v. The Mechanics' State Bank *et al.*, *Appellants.*

No. 17,433.

### SYLLABUS BY THE COURT.

1. Injunction—*Temporary—Notice.* A temporary injunction, which affects large pecuniary interests, should not be granted nor should a receiver be appointed to take the possession and control of business and property from its owners, without notice to the parties to be affected and before they have had an opportunity to be heard in relation to their rights, except in cases of the greatest emergency.

2. Corporations — *Minority Stockholders — Dissolution.* In the absence of express statutory authority the court has no authority, at the suit of an individual or minority stockholder, to dissolve a corporation, wind up its affairs and distribute its assets, and no such authority has been conferred in this state.

3. —— *Appointment of Temporary Receiver Not Justifiable.* Neither should a receiver be appointed to take temporary control of a bank and its business unless it is absolutely necessary and no other adequate remedy is afforded, and it should never be done where it is likely to do irreparable injury to others, or where greater injury will probably result from the appointment than if none was made.

4. —— *Solvent Bank Not Subject to Receivership on Account of Mismanagement.* While a court may appoint a receiver on the application of minority stockholders, where the business of the banking corporation has been so mismanaged as to render it insolvent or where it is absolutely necessary to preserve the property and business of the bank or the interests of the stockholders, a receiver should not be appointed to take the control of a solvent bank because of irregularities or misconduct of officers, where such irregularities or misconduct may

be corrected and cured by the board of directors or the bank commissioner, or are capable of adequate remedy by an injunction proceeding in a court of equity.

5. —— *Misconduct of Officers No Warrant for Appointing a Receiver.* The irregularities and misconduct of officers complained of herein are considered and are *held* not to have warranted the court in appointing a receiver to take the possession and control of the bank from its owners.

6. —— *Payment of Attorneys' Fees Not Warranted.* Nor was there authority in the court to order the payment of the plaintiff's attorneys out of the assets of the bank.

7. —— *Power of Majority Acting in Good Faith.* Under the law a majority of the stockholders have the control of a corporation and the majority of its directors have power to determine the policy to be pursued and to manage and direct its affairs, and the minority must submit to their judgment so long as the majority act in good faith and within the limitation of the law.

Appeal from Labette district court. Opinion filed May 6, 1911. Reversed.

*A. A. Osgood, George L. Davis,* and *Paul H. Kimball,* for the appellants.

*Dennis Madden, W. B. Glasse,* and *E. L. Burton,* for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action by W. E. Feess, C. A. Lambert, P. P. Duffy and C. K. Leinbach, stockholders in the Mechanics' State Bank, against the Mechanics' State Bank, Abner Davis, its president, and C. M. Bradway, its cashier, to enjoin the bank and its president and cashier from selling or disposing of any of the assets of the bank or taking them beyond the jurisdiction of the court, and they also asked that a receiver be appointed to take charge of the bank and its assets and perform such other duties as the court might direct. The bank was organized under the laws of Kansas to do a general banking business at Parsons, Kan. It had a capital of $50,000, divided into five

hundred shares of the par value of $100 each. Abner Davis, the president, owned three hundred and ninety-four shares and C. M. Bradway owned five shares of the capital stock. Of the complaining parties, Feess owned ten shares, Lambert two and one-half, Duffy two and one-half, Leinbach one, and Mary Allen, afterward made a party, one share. In the petition it was alleged that Davis and Bradway, who owned four-fifths of the stock and controlled the management of the bank, were managing it contrary to the wishes of the directors by allowing customers to overdraw their accounts; by depositing money in a bank in Oklahoma City; by loaning funds to Oklahoma parties and refusing to make loans to parties in Parsons; also in not having the required number of qualified directors; in not conforming to the requirements of the bank commissioner; and, further, that they were about to dispose of the assets of the bank in a way that would render the stock of the minority stockholders worthless. On October 28, 1910, the court, without notice to the defendants, granted a temporary injunction as prayed for, upon the giving of a 2000-dollar bond, and at the same time appointed a receiver, not only to take charge of the assets, but also to wind up the affairs of the bank. A bond in the sum of $100,000 was first required from the receiver. As soon as the depositors learned of the order of the court a run was made on the bank, and all depositors who presented themselves and asked for their money were paid in full. Before the receiver qualified the run had been made and a large part of the cash in the bank drawn out, and the receiver's bond was then reduced to $50,000. After the receiver took possession he represented to the court that the bank still had $11,150 cash on hand and that the depositors had all been paid, except a group of oil companies, all under one control, whose deposits amounted to $11,750, some of which had overdrawn their accounts, and that if a balance were struck the oil companies would be

owing the bank $79.65.   An application was therefore
made to withhold payment of these deposits until the
right of the bank to set off the overdrafts against them
was determined, and this was granted.   On November
3, 1910, the defendants moved for an increase of the
injunction bond, alleging that there was no ground for
the action; that it incited a run and wrecked the bank
and that it had already caused a damage of more than
$20,000, but the motion was denied.   On the same day
the defendants asked for the removal of the receiver
appointed by the court, reciting that he had previously
acted in bad faith with the bank; had arranged to pur-
chase twenty-five shares of stock with the understand-
ing that he would be elected as a director of the bank;
that he borrowed money and gave his note to the bank
for the ostensible purpose of paying for the stock
which he had agreed to buy but that he did not take or
pay for the stock, and, although he did not qualify as a
director, he had acted with the board and had voted
with others to approve the loan of $2500 to himself;
that he had conspired with plaintiffs, who only repre-
sented twenty-two shares of stock, to wreck the bank,
and that with them he had endeavored to compel de-
fendants, who represented four hundred and sixty-four
shares of stock, to sell their stock or buy plaintiffs'
stock.   It was also alleged that, aside from the unpaid
loan, he had previously overdrawn his account and had
failed to make it good; that he had procured the making
of a loan of $750 to parties, upon his guaranty, and
when they defaulted he had refused to make good his
guaranty; that a coal company, of which he was presi-
dent, had overdrawn its account with the bank and he
had failed to pay the overdrafts; that while acting as
director he had undertaken to obtain a loan of $10,000
from the bank for a relative, to be invested in a news-
paper enterprise, and when it was declined he became
incensed and entered into the conspiracy mentioned;
that he acted with plaintiffs in causing this action to

be brought in order that he might be appointed as re-
ceiver and thus obtain control of the bank, and that by
his fraudulent actions, his known hostility to defend-
ants and lack of familiarity with the banking business
he was an unfit person to have charge of the bank, and
they therefore asked his removal. In that connection
they asked that some other person be appointed in his
stead. The motion was denied. Afterward the de-
fendants answered alleging that plaintiffs only owned
three one-hundredths of the stock of the bank; that
there were five qualified directors, all of whom were
residents of Labette county, Kansas, except Davis, and
that one of them was plaintiff Feess; that plaintiffs
Lambert and Leinbach were elected in January, 1910,
but they never qualified as directors although they sub-
sequently acted in that capacity. They specifically de-
nied the charges of misconduct and mismanagement
made against them. They further alleged that the bank
had at all times been solvent; that its funds had been
loaned on good security and that their purpose had
been to make it a profitable institution and its stock a
desirable investment, and it was also averred that
Davis had offered plaintiffs $135 per share for the
stock held by them. They asked to have the injunction
dissolved and the receiver discharged.

The trial court made forty-six special findings of
fact holding most if not all of plaintiffs' allegations to
be true. The findings were to the effect that funds of
the bank had been deposited in a bank in Oklahoma
City, of which Davis was an officer, without consent
of the directors or of the bank commissioner; that the
president and cashier, contrary to the wishes of the
directors, had refused to make a loan of $7500 to per-
sons in Parsons to buy a newspaper; that certain city
warrants drawing 6 per cent interest had been sold
when other surplus funds of the bank were earning a
less rate of interest; that patrons of the bank were
permitted to overdraw their accounts; that loans had

been made upon insufficient security and without authority of the board; that they had refused to sell a controlling interest in the bank after agreeing to do so; that certain papers were discounted without authority; that the president had tried to find a purchaser of the assets of the bank and had contemplated a liquidation; also a consolidation of it with another bank, and had taken steps to that end, and that plaintiffs were compelled to resort to this action for relief for the reason that it would have been useless and vain to have appealed to defendants or the board. It was found, too, that the assets of the bank, on October 28, 1910, were insufficient to pay its liabilities. On these findings of fact the trial court drew three legal conclusions: (1) That the bank was not conducted in accordance with the laws of the state; (2) that the bank was insolvent; and (3) that the injunction should be made perpetual and the receiver should wind up the affairs of the bank. The defendants appeal, and earnestly insist that there was no ground for injunction; that there was no authority or justification for appointing a receiver; that many of the findings are not supported by the evidence; and that numerous trial errors were committed. There is also complaint of the ruling directing the receiver to pay plaintiffs' attorneys $1000 out of the funds of the bank.

The defendants have reason to complain of the rulings and judgment rendered by the trial court. The bank was a going concern, doing a fairly good business, it being alleged in the petition that the bank had money and property sufficient to pay all its depositors and also to pay each shareholder not less than 110 per cent of the face value of his capital stock. The court, upon *ex parte* application and without notice to the defendants, not only issued an injunction but appointed a receiver, and thus summarily wrested the property and business of the bank from its officers and owners. This

53—84 KAN.

was done because of dissensions among the stockholders and directors as to the proper method of conducting the business of the bank and where the complaining parties only owned seventeen of the five hundred shares of the capital stock. It is only in cases of the greatest emergency that courts are warranted in tying up business or property by injunction or by appointing a receiver to take property from the control of the owners without notice to the opposing parties. There are greater reasons for refusing to appoint a receiver upon an *ex parte* application than for granting an injunction without notice, and as to the latter this court has said that "a court or judge should never grant a temporary injunction in an action involving large pecuniary interests, or other important matters, without notice, where the party to be affected thereby can be readily notified, except in case of extreme emergency. The hasty and improvident granting of temporary injunctions without notice is not in accordance with a fair and orderly administration of justice." (*A. T. & S. F. Rld. Co. v. Fletcher*, 35 Kan. 236, syl. ¶ 7.) There was no reason why the bank and its officers might not have been easily notified, and there was no such emergency or immediate danger to the interests of plaintiffs as to justify the court in taking such summary and drastic action. (*French v. Gifford*, 30 Iowa, 148; 34 Cyc. 117; High, Receiv., 4th ed., pp. 128, 130.) In this instance the appointment that was made would not have been justified even if notice had been given. The court here not only placed the possession of the assets and business of the bank in a receiver, for which there appears to have been no real necessity, but it ordered him to wind up its affairs and thus practically ended its corporate existence. This was done, not at the instance of the state through its attorney-general or bank commissioner, but at the suit of minority stockholders. The court was without authority to make the order, and indeed there was no application for such an

order in the petition on which the order was granted. There is nothing in the statute which authorizes a court of equity to dissolve a corporation, or wind up its affairs, at the instance of a minority stockholder, and in the absence of express statutory authority it can not be done. For certain reasons and by certain methods the bank commissioner is authorized to have a receiver appointed and to wind up the affairs and business of a bank. (Laws 1908, ch. 14, § 1, Gen. Stat. 1909, § 487.) A corporation may be dissolved, its franchise taken away, its affairs wound up and its property distributed in an action brought by the state through its proper officer, but a court of equity can not interpose its authority to forfeit the franchise of a corporation, wind up its affairs or otherwise end its corporate existence at the instance of a stockholder.

The supreme court of Iowa has held that "in the absence of express statutory authority, jurisdiction of courts of equity does not exist over corporate bodies to such an extent as to justify them in dissolving corporations, or of winding up their affairs and sequestrating their property." (*Wallace v. Publishing Co.,* 101 Iowa, 313, 322.) The same view was taken in *Folger v. Columbian Insurance Company & trustees,* 99 Mass. 267, where it was held to be well established that a court of equity has no power, at the suit of an individual, to decree the dissolution of a domestic corporation and wind up its affairs unless such power has been conferred upon it by the terms of some statute. At common law no such power was vested in courts of equity to be exercised at the suit of an individual. Other authorities to the same point are: *Mason et al. v. Supreme Court of the Equitable League,* 77 Md. 483; *French Bank Case,* 53 Cal. 495; *Supreme Sitting of the Order of the Iron Hall v. Baker et al.,* 134 Ind. 293; *Texas Consol. Compress & Manufacturing Ass'n. v. Storrow,* 92 Fed. 5; *Strong v. McCagg, imp.,* 55 Wis. 624; *Pond v. Framingham & Lowell Railroad,* 130

Mass. 194; 10 Cyc. 1305, 1307; 4 Thomp. Corp. §§ 4539, 4540, 4553; and Beach, Receiv. § 403.

There was error in the order directing the winding up of the affairs and existence of the bank. Neither were there any good reasons for appointing a receiver to temporarily take control of the assets and business of the bank. There were other adequate remedies to correct any mismanagement of the business and to protect plaintiffs against the alleged misconduct of the bank officers. A receivership may be created upon the application of a stockholder where it is absolutely necessary.

It was held in *In re Lewis, Petitioner*, 52 Kan. 660, that under the code a receiver may be appointed at the suit of a stockholder "where the business and affairs of a corporation have been so mismanaged that it has become insolvent, and where it is made to appear that all the officers and directors of the same have conspired together to divert its business to another company, dissipate its funds, and fraudulently absorb and apply its assets to the individual benefit of such officers." (Syl. ¶ 1.) Conduct and conditions less serious than those enumerated would justify the appointment of a receiver, but it is a power that should be sparingly and cautiously exercised. It is a last-resort provision and is only to be employed where there is a pressing necessity and no other adequate remedy is afforded. It should not be used where it is likely to do irreparable injury to the rights and interests of others, nor where greater injury will probably result from the appointment than if none was made. Caution is especially necessary in case of a bank, which depends so much on public confidence and credit, and is so susceptible to injury from an imputation of mismanagement, dishonesty or weakness. Even a rumor of weakness or wrongdoing, however unfounded, may start a run and bring discredit and ruin to a solvent bank; but where a court summarily orders a receiver to take charge of

Feess v. Bank.

its assets and business, it necessarily impairs public confidence and paralyzes its business. In this instance it started a disastrous run which, to a great extent, operated to destroy instead of preserve the assets and business of the bank. In fact it put an end to its business life and sacrificed the interests of all the owners of stock, including the complaining parties who owned less than four per cent of the investment. Although a contrary finding was made, the bank, in our opinion, was a solvent, going concern, and upon plaintiffs' own statement its stock was worth a premium when the action was begun. The bank seemed to be well prepared to stand the run started by the unwarranted action. All depositors who presented their demands were paid in cash, and the record does not, in our opinion, sustain the finding of insolvency. There were disagreements in the board as to methods of business and the policy which should be pursued, but the derelictions complained of were such as might have been easily corrected through the action of the bank commissioner, or, at most, by an order of injunction.

It may have been that too much of the funds of the bank were kept or invested in Oklahoma City, as was alleged, and that a better plan would have been to have made more loans to parties in the vicinity of Parsons. That seems to have been the view of the bank commissioner at one time, but after the matter was brought to his attention that officer permitted the bank to carry on the business in the same way for about six months, and until the beginning of this action, without directing a change of methods. It may be assumed that if the bank commissioner had thought the policy pursued imperiled the safety or success of the business an order of discontinuance would have been made. If it was contrary to good banking, or to established rules, there was abundant authority in the bank commissioner to stop the practice, and if the of-

ficers did not follow his directions he had the power to remove them.

A ground of dissension on the board was the refusal of the cashier to make a loan of $7500 to parties to invest in a newspaper enterprise. It is claimed, and the court found, that the directors approved the loan, but four of the seven directors testified that it was not approved. The president stated that he·advised against it because, as he thought, it would result in the bank acquiring the newspaper and that he had never known such enterprises to pay out. Three of the directors favored it, but in view of all the testimony it can not be said that the officers of the bank acted fraudulently or against the best interests of the bank in declining so large a loan on the security offered. If a majority of the directors, who controlled the bank and the business, had insisted on the loan it could have been made over the objection of the president and cashier, and if the cashier had not carried out their direction he could have been deposed, either through the action of the board or the bank commissioner. (Laws 1909, ch. 59, § 4, Gen. Stat. 1909, § 518.) In either event the refusal gave no ground for the extraordinary action of appointing a receiver. Complaint is made that some loans were refused to other parties, but they are not entitled to serious consideration. It does not appear that fraud was committed or that loss resulted to the bank by reason of the refusal of any of the loans.

The action of the cashier in disposing of certain city warrants amounting to $1300, which drew interest at six per cent, and were past due, without the authority or consent of the board, is a subject of complaint. The cashier is vested with considerable discretion in making collections and in realizing on overdue paper. The president advised the cashier to dispose of the warrants as they were of uncertain value and only had a market value when a buyer was found, and the cashier stated that the money derived from

the sale was loaned to persons in the vicinity of the bank.    Even if the sale was unwise it afforded no ground for injunction or the appointment of a receiver.

It was charged and found that quite a number of the customers of the bank had overdrawn their accounts. The amount in each case was not large, and altogether amounted to about $2000 when the action was begun. There is reason to criticize the action of the cashier in permitting so many customers to overdraw, but what the financial condition of those who overdrew was, or whether there was much risk of loss from them, was not disclosed.    It is well known that depositors sometimes unintentionally overdraw, where their financial standing is such that a cashier would not be justified in turning down their checks.    Then again, an overdraft, for which provision had previously been made by one with ample means, would not be subject to much criticism if the banker acted in good faith. It does not appear that the bank was in great danger of loss from this source, and in any event it was something which the directors might have cured.    The amounts of the overdrafts might have been collected from the officers who paid out the money, as the statute provides that they shall be personally liable for the moneys so paid.    (Laws 1897, ch. 47, § 39, Gen. Stat. 1909, § 498.)

Much is said about loans to parties in Oklahoma but the greater part of these had been paid before the action was begun.    The policy pursued in respect to loans and discounts seems to have been satisfactory to a majority of the directors and to those owning the controlling interest and more than nine-tenths of the capital stock.    Those owning the majority of the stock claimed the right to control the management and policy of the bank, and a number of the matters of which complaint is made grew out of the differences of opinion in respect to what was the better policy.

The law gives the majority of the stockholders the right to control the policy and business of a corporation and the minority must submit to their decisions when the majority act in good faith and within their powers.

It has been said that "the very foundation principle of a corporation is that the majority of its stockholders have the right to manage its affairs, so long as they keep within their charter rights. No principle of law is more firmly fixed in our jurisprudence than the one which declares that the courts will not interfere in matters involving merely the judgment of the majority in exercising control over corporate affairs." (*Bartow Lumber Co. v. Enwright*, 131 Ga. 329, 333; see, also, 10 Cyc. 969.) The business course of the bank appears to have been satisfactory to all the stockholders, except to those owning less than four per cent of the stock.

There was complaint, too, that three of the directors were not properly qualified. Whether any of them were holding over is not disclosed by the record. It is found that Lambert and Leinbach, who did not qualify, met with the board and took part in the proceedings as *de facto* officers without protest or question by anyone. Madden was chosen to succeed Leinbach and he, too, acted without regularly qualifying, although he had not yet paid for the stock which he had arranged to purchase. There was irregularity in proceeding with the business of the bank when all the elected directors had not been duly qualified, but it appears that two of those not qualified are now attacking the bank because of this delinquency. The omission could have been remedied without taking the bank and its assets from the control of its owners.

It was charged, and the court found, that Davis, the president, at one time agreed that he would sell a part of his stock to local parties—enough to give them a controlling interest in the bank—and that he had refused to carry out the agreement, but his failure to sell his

stock is no basis for the kind of action that was brought.

There is a claim, and some testimony, that Davis had made an effort to sell the assets of the bank, and that he had given notice of a stockholders' meeting, to be held on October 28, 1910, and that his purpose was either to sell the assets of the bank or liquidate the same through a bank at Kansas City, and the court found that this would have been done if it had not been prevented by the granting of the injunction. Just what action was proposed to be taken at the meeting can not be definitely determined, for no notice of the purpose was stated and the meeting was not held. Davis denied that he had any intention of selling the assets or of making any disposition of his interests in the bank that would have been injurious to the minority stockholders. Some proof was offered, that was credited by the trial court, to the effect that Davis was negotiating a sale of the assets of the bank in a way that might have injured the bank and resulted to the detriment of the minority stockholders. For that reason it can not be said that there was no ground for enjoining the sale of the assets of the bank or the taking of the same out of the state.

On a consideration of all the facts in the case it is clear that there was no necessity for the appointing of a receiver and the wresting of the bank and its management from the owners. The irregularities and misconduct, which have been referred to, were not so culpable and did not so jeopardize the bank and the rights of the stockholders as to warrant a receiver and the practical destruction of the business. It is argued that defendants are not entitled to challenge the appointment of a receiver because when they asked for the removal of the one appointed, on the ground of interest and unfitness, they suggested that another be appointed in his stead. It is clear from the record that defendants were not consenting to a receivership. They had

no opportunity to object when the appointment was made, and on the motion for additional security they alleged that there was no ground for the action that was brought, and that when an opportunity was given they intended to make a showing to that effect. When the motion was made to remove Madden as receiver, because of interest and unfitness, the run had been made and the injury done to the bank. It was probably so hurt at that time that it was unable to stand alone while the right to a receivership was being tried. The suggestion of defendants was no more than that some disinterested person should hold what remained of the assets until the question of injunction and receivership should be determined. In their answer they alleged that there were no grounds for injunction or a receivership, and they asked that the injunction be dissolved and the receiver discharged. They objected to the introduction of any testimony upon the same grounds, and at the end of the testimony a like motion was made and overruled. Throughout the controversy the defendants were challenging the right to appoint a receiver, and it would be a harsh rule to hold that they had estopped themselves to contest the question because they suggested that some one else than an interested person should hold possession of the bank while the right to a receiver was being tested. Neither this, nor the stipulation as to the payment of certain depositors or as to the disposition of certain property belonging to the bank, prevents a review of the rulings on the main questions which divide the parties.

It being determined that no grounds existed which justified the appointment of a receiver, it must be held that there was error in ordering the payment of $1000 out of the assets of the bank as a fee to plaintiffs' attorneys. The action, instead of inuring to the benefit of the bank, operated to diminish, if not entirely destroy, its business. No property was recovered or

funds restored through the action of plaintiffs.   Under no principle of equity are these parties entitled to have their attorneys paid out of the assets of the corporation.

The judgment is reversed and the cause is remanded for further proceedings.