No. 29,941.

JOHN WRIGHT et al., *Appellees*, v. THE FEDERAL RESERVE LIFE INSURANCE COMPANY et al., *Appellants.*

(293 Pac. 945.)

Opinion filed November 20, 1930.

*E. R. Sloan, A. M. Cole,* both of Holton, *J. J. Schenck, F. A. Sloan, C. P. Schenck,* all of Topeka, and *J. H. Brady,* of Kansas City, for the appellants.

*Thomas F. Doran, Clayton E. Kline, Harry W. Colmery* and *M. F. Cosgrove,* all of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: On August 27, 1930, the plaintiffs brought this action in the district court of Shawnee county, alleging that they owned an aggregate of fifteen shares of the stock of the Federal Reserve Life Insurance Company, defendant, of the par value of $10 per share, and that the defendant company had been grossly mismanaged, its capital and surplus of $600,000 dissipated, its liabilities greatly in excess of its assets, and that a receiver should be appointed to resell its insurance risks and to wind up its affairs.

On the same day an order was procured from the district court, without notice, restraining the officers and directors of the defendant company from making any expenditures of money except where necessary to carry on the business of the company.

On August 28, 1930, plaintiffs filed a motion for the appointment of a receiver for the defendant company because of the alleged insolvency and for an order directing him to prosecute his duties.

On August 29, 1930, plaintiffs caused a subpœna *duces tecum* to be issued, directed to the commissioner of insurance, commanding his attendance in the district court on September 3, 1930, to testify on the matters involved in plaintiffs' petition, and that—

". . . You, Chas. F. Hobbs, insurance commissioner, are then and there to bring and have with you the report made to the insurance commissioner of the state of Kansas concerning the investigation made of the affairs of the Federal Reserve Life Insurance Company under the direction of the insurance departments of the states of Kansas, Missouri and Indiana, and this do you in no wise omit, under penalty of the law."

On September 3, 1930, defendants filed a demurrer to plaintiffs' petition on various grounds:

"First: That the court has no jurisdiction of the subject matter of the action.

"Second: That the plaintiffs have no legal capacity to sue.

"Third: That the petition does not state facts sufficient to constitute a cause of action."

On October 11, 1930, the trial court overruled the demurrer. On the same day an appeal was taken thereon, and by order of this court proceedings in the district court were stayed until the propriety of its ruling on the demurrer could be reviewed.

To determine that question the allegations of plaintiffs' petition must be examined at some length. It is alleged that the defendant is a domestic insurance corporation organized in 1919 with a capital of $100,000 divided into 10,000 shares of the par value of $10 each. These shares were sold at a premium, and thereafter the capital was repeatedly increased and additional issues of stock were sold until the company had acquired a capital and surplus of $600,000. In 1925 the corporation again undertook to increase its capital and authorized an issue of 10,000 additional shares, but that project has not been carried into effect.

It is alleged that in 1928 three persons, Wilson, Merritt and Henning, who then held the offices of president, vice president and

general attorney of the defendant company, entered into a conspiracy with one Bushman, pursuant to which $400,000 of Liberty bonds belonging to the defendant were withdrawn from the custody of the state treasurer, on approval of the commissioner of insurance, who at that time was William R. Baker, which bonds (it may be inferred but is not alleged) were delivered to Bushman. Bushman executed a mortgage to the defendant company for $400,000 covering lands in Michigan, which were not worth more than $160,000 at the date of execution. Those Liberty bonds were sold and Bushman loaned the proceeds, $400,000, to Wilson, Merritt and Henning; and therewith those three persons, then officers of the defendant company, purchased the stock of the Farmers National Life Insurance Company, of Huntington, Ind., and sold the reinsurance of that company to this defendant corporation. At the time this sale was effected, November 30, 1928, the Indiana company had $40,000,000 of insurance in force; the sale price was $26 per $1,000 of insurance, making the total consideration $1,083,000; but by the terms of the purchase contract the price therefor was to be paid out of 75 per cent of the proceeds of the insurance thus taken over from the Indiana company, plus 5 per cent interest on deferred payments. It is alleged that the money used to purchase the stock of the Indiana company was in fact the money of the defendant company and that it is equitably entitled to the benefits of the original contract of purchase, and that the mortgage given by Bushman should be canceled. It is also alleged that of the mortgages taken over by defendant as part of the assets of the Indiana company $753,157.29 thereof are past due and in default.

Plaintiffs further allege that sometime, date not stated, the defendant company "held" mortgages aggregating $41,550 given (by whom not stated) for the purchase of the stock of the Commonwealth Fire Insurance Company, which transaction was negotiated through the connivance of one Frank Travis, treasurer of the defendant company; and that payment of these mortgages is being resisted by their makers, and are of doubtful value.

Plaintiffs also allege that—

"The defendant, the Federal Reserve Life Insurance Company, has either loaned direct to B. Frank Bushman, now president of the Federal Reserve Life Insurance Company, or purchased from him mortgages totaling the sum of $725,480.00. . . . That all of said mortgages to the said B. Frank Bushman, or purchased from or through him, are made in violation of the laws of

the state of Kansas, which provide that the funds of an insurance company may be invested in loans secured by mortgages on unencumbered real estate worth 100 per cent more than the sum loaned thereon; . . . that the actual value of the land on which said mortgages were given amounts to the sum of $566,570.00; . . . all of which was known to and concurred in by the present officers and directors of the Federal Reserve Life Insurance Company, defendants herein. That no effort is being made by the present officers and directors to replace the impaired securities now on deposit with the state treasurer of the state of Kansas, or to foreclose any of the past-due mortgages, although many have been delinquent four or five years."

Plaintiffs further alleged that on account of the financial condition of the company and the mismanagement of its affairs by its officers and directors, policyholders are either canceling their policies or borrowing the full loan value thereof, and that the cancellations of the last nine months aggregate more than $10,000,000; and that the only assets defendant now has are the sales value of reinsuring its insurance risks now in force; that the board of directors are paying themselves and employees exorbitant salaries; and that—

"The entire capital and surplus of the company has been dissipated and by reason of the gross mismanagement of the present officers and directors of said company, the defendant herein, the legal reserve . . . of the insurance policies is being greatly impaired; . . . that the liabilities are far in excess of the assets, and that the Federal Reserve Life Insurance Company is insolvent. That for the purpose of protecting the rights of these plaintiffs, and all other stockholders similarly situated, it is necessary that a receiver be appointed for the purpose of taking full charge of the affairs of the Federal Reserve Life Insurance Company, disposing of its assets, taking such action as may be necessary under the direction of this court to cancel all stock illegally issued, and for the purpose of winding up the affairs of said company."

The prayer of the petition reads—

"Wherefore, plaintiffs pray for an order of this court appointing a receiver for the defendant, the Federal Reserve Life Insurance Company; for a further order directing said receiver to take charge of said company and its affairs, and to make an immediate sale of its assets, including the reinsurance, to bring such actions as may be necessary to cancel stock illegally issued; to bring such further actions as may be necessary to cancel the certificate of indebtedness to the Farmers National Life Insurance Company of America, and to recover all money paid to the Farmers National Life Insurance Company of America; to wind up the affairs of said company, and to perform such other duties as may from time to time be directed by the court."

Did the foregoing petition state a cause of action which could be maintained at the instance of these three plaintiffs holding an aggregate of fifteen shares of stock of the par value of $10 for each share?

It is the contention of defendants that it did not. They contend that under the provisions of the insurance code (Laws of 1927, ch. 231) all the matters alleged in plaintiff's petition are under the supervisory jurisdiction of the commissioner of insurance; and where, as in this case, there has been neither fraud, corruption nor official delinquency on his part, his jurisdiction over the affairs of the defendant company in the first instance is exclusive, and that the district court is without jurisdiction to meddle with the company's affairs at the suit of private persons holding a trivial amount of its capital stock.

For the purpose of determining the propriety of the demurrer, the allegations of the petition must be deemed to be true. The demurrer also searches the entire record and takes cognizance of plaintiffs' subpœna *duces tecum* directed to the present commissioner of insurance. From its recitals the significant fact is gleaned that an official investigation of the affairs of defendant company has been made by the insurance departments of the states of Kansas, Missouri and Indiana, and that a report thereof is already in the hands of the insurance commissioner.

The law presumes that a public officer will do his duty, and therefore this court is bound to deal with the legal question before us with the presumption that the commissioner of insurance is faithfully discharging his official duty with reference to the alleged delinquencies of the defendant company. The insurance code confers comprehensive powers on the commissioner to control and regulate the manner in which insurance companies shall conduct their business. (R. S. Supp. 40-103.) He has supervision over the sale of their stock and over their obligations. (R. S. Supp. 40-104.) With his consent, insurance companies may reinsure risks of other insurance companies. (R. S. Supp. 40-221.) Securities deposited with the state treasurer as required of domestic life insurance companies can only be withdrawn upon his order (R. S. Supp. 40-401) and the net reserve of all policies and annuity bonds must be delivered to him to be deposited with the state treasurer (R. S. Supp. 40-404) and can only be surrendered or exchanged upon his sanction (R. S. Supp. 40-405, 406). Each policy of insurance or annuity bond requires his certificate under seal of his office, reciting that it is secured by bonds or notes and mortgages deposited with the state treasurer in an amount equal to its full legal reserve. (R. S. Supp. 40-407.) Every life insurance company doing business in this state

is required to make annual reports to the commissioner of insurance upon blank forms furnished by him (R. S. Supp. 40-409), and all such companies must make prompt and truthful answers to inquiries made by him concerning their corporate affairs (R. S. Supp. 40-225). He is authorized to examine into the affairs of such companies whenever he deems it advisable, or he may accept the report of any examination made upon the authority of the supervising insurance official of any other state. From the subpœna *duces tecum* directed to the commissioner of insurance it would appear that the insurance departments of Kansas, Missouri and Indiana collaborated in such an examination and have lately completed it. It must, therefore, be inferred that, from that official examination of the insurance departments of these three states, the commissioner became fully advised of the matters alleged in plaintiffs' petition and that he is dealing with them as the statute directs. (R. S. Supp. 40-222.) The pertinent provision reads:

". . . Whenever it appears to the commissioner of insurance from such examination or other satisfactory evidence that the solvency of any such insurance company is impaired, or that it is doing business in violation of any of the laws of this state, or that its affairs are in an unsound condition so as to endanger its policyholders, the commissioner of insurance shall, before filing such report or making the same public, grant such company upon reasonable notice, a hearing, and, if on such hearing the report be confirmed, he shall suspend the certificate of authority of such company until its solvency shall have been fully restored and the laws of the state fully complied with; and he may, if there is an unreasonable delay in restoring the solvency of such company and in complying with the law, revoke the certificate of authority of such company to do business in this state. Upon revoking any such certificate he may communicate the fact to the attorney-general, whose duty it shall be to commence and prosecute an action in the proper court to dissolve such company or to enjoin the same from doing or transacting business in this state."

One feature of the statute just quoted is peculiarly significant. If, from his examination or other satisfactory evidence, the commissioner discover that the solvency of any insurance company has been impaired, or that its affairs are in an unsound condition, before he shall make public the fact of its impaired solvency, or of its unsound condition, he shall give the company some time to set its corporate affairs to rights; and if there is an unreasonable delay in restoring its solvency, or in getting its affairs into conformity with the law, he may revoke its license and communicate the fact to the attorney-general, whose duty it shall then be to commence

such an action as the three plaintiffs herein seek to prosecute upon their private initiative.

Presumably the commissioner has given orders to the defendant company to get rid of its bad investments and to restore its capital and rehabilitate its reserves; and we must presume that the corporation's progress in complying with those orders is satisfactory to the commissioner; and so long as that officer does not abuse his discretion nor neglect his official duty, neither these plaintiffs, nor the trial court, nor this court, may supersede his authority nor interfere with these very matters intrusted to his official supervision and regulation under the literal provisions of the insurance code.

It is very obvious, we think, that such an action as plaintiffs seek to maintain seriously interferes with the discharge of the official duties imposed upon the commissioner of insurance. Indeed, the filing of this ill-advised action has already frustrated in some degree the wise purposes of the insurance code. The statute contemplates that a story so damaging to the prestige of an insurance corporation as that alleged in plaintiffs' petition shall not be given to the public until the delinquent corporation shall have had a reasonable opportunity to correct such a condition of its affairs; but by the filing of this action all these damaging allegations are given to the public in advance of their judicial ascertainment and before the defendant company has had a reasonable opportunity to undo the mischief caused by the mismanagement of its affairs. Of course, the courts must take plaintiffs' allegations of fact as true, for the consideration of the demurrer; but the legislature realized quite clearly that the public understands naught of the technical significance of a demurrer; and having intrusted the powers of supervision and visitation of life insurance companies upon a public officer who must be a "person well versed and experienced in the business of insurance and matters relating thereto" (R. S. Supp. 40-109), it must be held that the legislature did not intend that the courts of this state should be used to give adverse publicity to the financial and business affairs of a life insurance company unless it failed to correct its shortcomings within the reasonable time granted to it for that purpose by the insurance commissioner.

These matters are so thoroughly covered by statute that the conclusion we reach does not need citation of analogous decisions to sustain it. The bench and bar are aware how greatly the state's legitimate powers of supervision and visitation have been extended

over business enterprises in the last decade or two, especially those kinds of business which are public or quasi-public in their nature. (*State, ex rel., v. Railway Co.,* 76 Kan. 467, 92 Pac. 606, 216 U. S. 262, 54 L. Ed. 472; *German Alliance Ins. Co. v. Kansas,* 233 U. S. 389, 58 L. Ed. 1011; *Mutual Film Corp. v. Ohio Indus'l Comm.,* 236 U. S. 230, 59 L. Ed. 552; *Mutual Film Corp. v. Kansas,* 236 U. S. 248, 59 L. Ed. 561; *State, ex rel., v. Postal Telegraph Co.,* 96 Kan. 298, 150 Pac. 544. See, also, *Ætna Ins. Co. v. Travis,* 130 Kan. 2, 285 Pac. 522.)

. Contemporaneous with the expansion of governmental power over corporate business and the imposition of important duties on the state's own officials in relation thereto, a tendency to limit officious meddling on the part. of others in their affairs may also be noted: (*Feess v. Bank,* 84 Kan. 828, 115 Pac. 563; *Jeffries v. Bacastow,* 90 Kan. 495, 135 Pac. 583; *City of Parsons v. Water Supply & Power Co.,* 104 Kan. 294, 178 Pac. 438; *Telephone Association v. Telephone Co.,* 107 Kan. 169, 190 Pac. 747; *Labette County Comm'rs v. Peterson,* 118 Kan. 560; 235 Pac. 848; *Kansas Gas & Elec. Co. v. Public Serv. Comm.,* 124 Kan. 690, 261 Pac. 592.)

In 2 Tardy's Smith on Receivers, 1438, it is said:

"There is, however, a class of corporations, such as insurance companies, benefit and fraternal societies, building and loan associations, various sorts of investment companies, and the like, of such a character that the appointment of a receiver almost necessarily means the liquidation of the company's affairs. This result is due partly for the reason, just as was pointed out in the case of banks, that the effect of the appointment upon the general public, upon whom the corporation relies for its business, is such as to ruin the company's credit and thus practically destroy the possibility of a continuance of its business." (p. 1438.)

"In practically every jurisdiction statutes have been passed dealing especially with this class of corporations. Because of their peculiar relations to the public and the dangers to the public inherent in careless or corrupt management of their affairs, it is universally recognized that, under its police power, the state may exercise extensive visitorial and regulatory supervision over the management of such concerns. Usually there is created a state supervisory officer or department; the corporations are required to make frequent detailed reports to the officer or department; the state authority is empowered to demand the correction or elimination of methods of business considered wrongful or precarious, . . . These statutes are passed for the benefit of the corporations as well as the public." (p. 1440.)

"Many of the statutes expressly provide that a receiver shall not be appointed over any such corporation except at the instance of the state authority to whom is given the right, or even, in a proper case, the duty, of

making the application. But, whether there is such an express provision in the statute or not, it is generally held, on the grounds and for the reasons above indicated, that such statutes provide an exclusive method for bringing such institutions under a receivership and that the courts have not authority to appoint receivers at the instance of any other applicant." (p. 1442.)

Cases supporting the text just quoted, also contra thereto and criticizing it, are cited in the briefs of counsel, but the demands upon our time will not permit us to analyze them here. Moreover, as we have said, the legal question with which we have to deal is governed by our local statutes. Counsel for plaintiffs state that this action was brought by virtue of the authority of the 5th subdivision of section 255 of the civil code (R. S. 60-1201), which provides that a receiver may be appointed by the district court—

"In the cases provided in this code and by special statutes when a corporation . . . is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights."

As we have seen, however, the plaintiffs' action interferes with the exercise of the authority vested in the commissioner of insurance and with the performance of his duty in dealing with the alleged corporate delinquencies of defendant according to his own discretion within the mandatory guidance of the insurance code. That code is a later expression of the legislative will than the subdivision of the civil code relied on by plaintiffs, and to the extent that the two statutes cannot be harmonized the earlier enactment must yield to the later, and the provisions of the insurance code are controlling. (*Arkansas City v. Turner, State Auditor*, 116 Kan. 407, 226 Pac. 1009.) But the 5th subdivision of the code section just quoted contemplates the possibility of cases providing for receivers under special statutes. In a case of insolvency or threatened insolvency of an insurance company a receiver is not to be appointed, nor asked for, until the commissioner of insurance has given his directions to the company to set its corporate affairs in order and to correct its shortcomings, nor thereafter until the delinquent corporation has had a reasonable opportunity to comply therewith.

But it is argued that the stockholders have no power to compel the commissioner of insurance to take steps to set to rights the mismanaged affairs of an insurance company. We hold otherwise. The law of this state does not countenance the probability that a public officer will not do his duty. He must do it, under penalty of ouster or impeachment for official dereliction. The statute says that

whenever it appears to the insurance commissioner on satisfactory evidence that the solvency of an insurance company has been impaired, or that it is doing business in violation of law, or that its affairs are in an unsound condition, that officer shall—not may—proceed to have such matters put to rights if that can be done, otherwise a receivership and a winding up is to follow as the insurance code provides. The plaintiffs do not intimate that they laid the matters alleged in their petition before the insurance commissioner. They do not allege that being apprised of the status of the company's affairs in the report of the examination made by his own department, in collaboration with the insurance officials of the states of Missouri and Indiana, he has been derelict in requiring the defendant company to mend its ways and to set about the restoration of its finances, nor that the defendant company has been recalcitrant and disobedient to the requirements of the insurance commissioner.

It therefore appears that defendants' demurrer to plaintiffs' petition was good on all the grounds pleaded, and it should have been sustained. The judgment of the district court is reversed and the cause remanded with instructions to set aside its ruling on the demurrer, and to sustain it, and to dismiss the action.