No. 33,699

In the Matter of the Estate of James Brown, Deceased. (FRANK SCHRECKLER, as Executor, *Appellant,* v. JAMES J. BROWN, *Appellee.*)

(76 P. 2d 857)

Opinion filed March 5, 1938.

*James V. Humphrey* and *Arthur S. Humphrey,* both of Junction City, for the appellant.

*U. S. Weary,* of Junction City, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This is an appeal from a judgment of the district court disapproving an executor's final report and ordering him to account for money paid to him by the heir-at-law in Wyoming under circumstances as follows:

James Brown was a retired army sergeant who resided in Junction City. He had a brother, M. H. Brown, who resided at Riverton, Wyo. Both were single men, and each had made a will in favor of the other. Sometime early in 1935, Brown's Wyoming brother died, leaving to his Kansas brother an estimated estate of $40,000. Brown went to Wyoming to see about it. While there he, too, died, on April 3, 1935, leaving a will in Junction City in which this appellant, Frank Schreckler, a postal clerk of Junction City, was named as executor.

Schreckler qualified as executor, and shortly thereafter, in April, 1935, by authority and approval of the probate court of Geary county, he went to Wyoming, in company with an attorney, to attend to the affairs of his executorship. In Wyoming he and his Junction City attorney engaged the services of a local attorney, F. B. Sheldon, Jr., and filed an application for the probate of the will of James Brown in Fremont county, Wyoming.

Schreckler then returned to Kansas and reported his doings to the probate court. The expense of his trip to Wyoming and for the services of the attorney who accompanied him was allowed by the court and charged against the estate.

Some time later, on May 12, 1935, Schreckler returned to Wyoming as executor and at the expense of the estate. Meantime the Wyoming court had appointed one W. J. Otto as coadministrator of the M. H. Brown estate. The nephew and sole heir-at-law of both the deceased Browns, one James J. Brown, of Pittston, Pa., had arrived in Riverton, Wyo., and had engaged lawyers, G. H. Paul and G. J. Christie, to look after his interests.

In the Wyoming court, in which Schreckler had filed his application to admit to probate the will of Sergeant James Brown, a legal controversy arose over the question whether Sergeant Brown's will should be probated for the sole purpose of appointing the executor named in the will, when the sole beneficiary of the will had predeceased the testator, and when the sole heir-at-law of the testator desired to oppose its probate. After arguing the matter to the Wyo-

ming court, the hearing was adjourned for two days, during which time Schreckler and his Wyoming lawyer, Sheldon, and James J. Brown, the heir-at-law, effected a settlement whereby Schreckler, in consideration of $1,750, agreed to withdraw his application to probate the Kansas brother's will. The heir-at-law gave Schreckler his note, payable in five days, for that amount; the application was withdrawn; the Wyoming court then allowed a partial distribution of $6,000 of the M. H. Brown estate; and after some maneuvers which threatened a lawsuit over the $1,750 note, it was paid. Sheldon, Schreckler's attorney, retained $583.33 as his fee, and paid the entire balance, $1,166.67, to Schreckler. His Junction City attorney had advised against the settlement as improper, and declined to accept any portion of the proceeds as an attorney fee. Schreckler retained the money as his own; he did not account for it to the probate court of Geary county; and that tribunal declined to require him to do so.

On appeal to the district court the whole transaction was aired at length, but no material dispute of fact was developed. Schreckler frankly testified that the $1,750 note which his attorney later cashed "was given me to withdraw as executor."

The trial court found—

"That the said Frank Schreckler received said $1,750 in a matter connected with the estate of James Brown, deceased, and received the same while he was acting in the capacity of executor of said estate, and that it is immaterial so far as the decision of this case is concerned, whether the said Frank Schreckler received said sum in consideration of withdrawing his application to act as executor of said estate in Wyoming, as contended for by said Schreckler, or whether he received said sum to be used in payment of administration expenses in the probate court of Geary county, Kansas, for the reason that in the one case the action of the said Schreckler was illegal and a violation of his obligation as a trustee, and in the other case he admittedly would have to account, and that he would account to the appellant for the net amount received by him of $1,166.67, and that in the settlement this sum should be surcharged against fees and expenses heretofore allowed said executor for himself and attorney's fees in said estate in the said sum of $1,-166.67; and that otherwise the account of said executor should be approved."

Judgment was entered accordingly, and the case is before us for review.

Appellant raises and argues four questions suggested by the record:

1. Did the trial court have jurisdiction?

2. Can one party to an illegal transaction recover from the other the consideration he paid?

3. Can a person who has been sued on his promissory note given as consideration for an illegal contract and who settles that suit by payment without setting up his defenses recover the sum paid in a subsequent action?

4. Did the trial court abuse its discretion in surcharging the executor's account with the moneys he obtained in Wyoming?

Touching these points in order, we shall give a short answer to the first question. Certainly the trial court had jurisdiction. (G. S. 1935, 22-1101 *et seq.;* Id., 20-301; Id., 60-3301.) An appeal from the probate court is tried *de novo* in the district court, although the jurisdiction of the latter is no broader than was that of the probate court. (*Ross v. Woollard,* 75 Kan. 383, 89 Pac. 680; *Pee v. Carlyle,* 120 Kan. 200, 204, 243 Pac. 296.) See, also, *In re Estate of Dennis,* 146 Kan. 121, 123, 124, 68 P. 2d 1083.

Touching the second and third questions advanced for discussion by appellant, we must hold that he entirely misconceives the nature of the subject matter of this appeal. The question in the probate court, and which continued to be the question on appeal to the district court and to this court, was whether the final settlement of the executor's account should have been approved as rendered or whether he should have been surcharged with the money he obtained in Wyoming while on a lawful errand to that state in his official capacity as executor. The executor concedes that his transaction with the heir-at-law to withdraw his application to the Wyoming court for appointment as executor was illegal. His excuse that he did not know it was illegal, whether morally exonerative or not, was of no consequence. His Kansas lawyer so advised him and declined to participate in it. And it must be kept in mind that all defendant did in Wyoming, whether well- or ill-done, was as executor, as an officer of the probate court of Geary county, Kansas.

We can give no countenance to the argument that this is a lawsuit by one private person to recover from another private person a sum of money paid in the course of an illegal transaction, nor to recover a sum of money paid pursuant to the settlement of the action filed by defendant in Wyoming to recover on the promissory note of the heir-at-law. Neither do we regard it as important that the trial court's judgment surcharging the executor's account with the proceeds of the Wyoming transaction will enhance the amount

of Sergeant Brown's estate—with the incidental result that the other party to the illegal transaction in Wyoming, who happens to be the sole heir-at-law, will eventually get back a substantial part of this money now in the pocket of his fellow-participant in that illegal transaction.

Of course, it is a trite and commonplace maxim of the law that where parties are equally in the wrong the courts will not give one legal redress against the other but will leave them where they find them. *In pari delicto potior est conditio defendentis et possidentis.* (*Ainsworth v. Miller,* 20 Kan. 220; 6 R. C. L. 825; Id., 829; 1 Am. Jur. 414, 415.) See, also, *Mason v. McGugin,* 118 Kan. 663, 665, 236 Pac. 845.

The vice of a maxim is that sometimes lawyers and judges are apt to seize on it to govern cases to which if more critically examined it should not be applied. To apply it in this case would be to ignore the court's responsibility to require and enforce the high and exacting standard of official ethics which rests on an executor as a functionary of the court itself. In *Alumbaugh v. Hedges,* 125 Kan. 449, 265 Pac. 50, this court referred to the general rule of law applicable to all sorts of functionaries who are entrusted with the care of other men's affairs. It was there said:

"Executors, administrators, guardians, trustees, and functionaries of that general character may not traffic to their own private advantage in estates or properties towards which they have any official or moral responsibilities. This rule is as much a principle of ethics and practical honesty as it is of law. The moral philosophy which underlies the rule was comprehensively treated in *Frazier v. Jeakins,* 64 Kan. 615, 68 Pac. 24, in which is included a quotation from *Staats v. Bergen,* 17 N. J. Eq. 554, which deserves to be repeated:

" 'So jealous is the law upon this point, that a trustee may not put himself in a position in which to be honest must be a strain on him.' (p. 619.) (Citations.)" (p. 453.)

See, also, *Beck v. Wacker,* 127 Kan. 9, 272 Pac. 175; *Woodbury v. Schofield,* 131 Kan. 432, 292 Pac. 802; *Crowley v. Nixon,* 132 Kan. 552, 296 Pac. 376; *Mayse v. Minneola Coöp. Exchange,* 139 Kan. 24, 30 P. 2d 120; *Vincent v. Werner,* 140 Kan. 599, 38 P. 2d 687.

In other jurisdictions this exacting standard of official probity is generally enforced. In *Smith v. Tolversen,* 190 Minn. 410, 252 N. W. 423, an executor and trustee appealed from a judgment surcharging his account. In affirming the judgment, the supreme court of Minnesota said:

"Before going further with the facts, it is well to repeat as premise of decision that 'a trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive,' is the standard of his behavior. That rule 'is unbending and inveterate.' (*Meinhard v. Salmon*, 249 N. Y. 458, 464, 164 N. E. 545, 546, 62 A. L. R. 1.)" (p. 413.)

In the New York case just cited Chief Justice Cardozo said:

"Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions (*Wendt v. Fischer*, 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." (p. 464.)

In *Eversole v. Holliday*, 131 Ky. 202, 114 S. W. 1195, the action was by a sheriff against his deputy for an accounting of funds which had come into the hands of the latter in his official capacity. Defendant pleaded that plaintiff held his position as a result of a corrupt deal engineered by defendant whereby the former sheriff, one Cornett, had been induced to resign and that defendant had procured plaintiff's appointment upon his agreement to appoint defendant his deputy, and that the sheriff's fees were to be divided between them. The familiar rule that parties to an illegal transaction will not be heard to complain of it or its breach in a court of justice was invoked, but the Kentucky supreme court said:

"Though the contract with Cornett may have been against public policy, the fact yet remains that Holliday was appointed sheriff and Eversole deputy sheriff. As such, they were public officers of the state, and subject to the laws thereof in the collection of, and accounting for, the revenues of the state. To hold that the sheriff could not require his deputy to settle because they both secured their office through an unlawful contract with another would indeed be a dangerous doctrine. . . .

" '(2) Although such a contract is void, it does not necessarily follow that the sheriff is without any remedy against the deputy for his part of the fees, or that the sureties of the sheriff, who were induced to become bound by reason of the contract, have no equitable claim to this fund in the hands of the deputy.'

"Applying the rule above mentioned to the facts of this case, we are of the opinion that, although the contract between appellant and appellee and E. H. Cornett was void as against public safety, the invalidity of that contract will

not prevent a recovery by appellee for any sum that may have been due him by appellant upon a final accounting between them in their official capacity." (p. 205.)

In *Sando v. Smith*, 237 Ill. App. 570, the plaintiff and two sisters and their defendant brother were the only heirs of deceased intestate. The defendant brother was appointed administrator, and apparently he had falsely represented that he held an order of court which required plaintiff to deliver to him certain moneys, bank books and diamonds received by her as a gift *causa mortis* from the intestate. Eventually this matter became the subject of litigation and the defendant brother contended that plaintiff's ready surrender of the property to him was inconsistent with her later claim of the property being a gift. The Illinois court said:

"It is true that, as a general rule, money voluntarily paid to another under a claim of right to the payment and with knowledge of the facts, by the person making the payment, cannot be recovered back on the ground that the claim was illegal. . . . But, in our opinion, this rule that money paid with a full knowledge of all the facts and under a misapprehension as to legal rights may not be recovered back is not applicable to the payments made to an officer of the court, such as a receiver or a trustee in bankruptcy or the administrator or executor of an estate." (p. 580.)

In the same opinion the court cited and quoted from English cases, including *Ex parte Simmonds*, 16 Q. B. Div. 308, 312, where Lord Esher, Master of the Rolls, said:

"A rule has been adopted by courts of law for the purpose of putting an end to litigation, that, if one litigant party has obtained money from the other erroneously, under a mistake of law, the party who has paid it cannot afterwards recover it. But the court has never intimated that it is a high-minded thing to keep money obtained in this way; the court allows the party who has obtained it to do a shabby thing in order to avoid a greater evil, in order, that is, to put an end to litigation. But James, L. J., laid it down in *ex parte James* [L. R. 9 Ch. 609] that, although the court will not prevent a litigant party from acting in this way, it will not act so itself, and it will not allow its own officer to act so. It will direct its officer to do that which any high-minded man would do."

In 3 Bogert on Trusts and Trustees, section 543, the gist of the foregoing decisions from which we have quoted is summarized. See, also, section 492, of the same work, where miscellaneous examples of a fiduciary seeking selfish advantage are cited and discussed.

The case of *Ellicott v. Chamberlin*, 38 N. J. Eq. 604, is cited by appellant as being at variance with the authorities just quoted. In that case the executor drove a hard bargain with the sole heir-at-law

as a consideration for renouncing his executorship. She agreed to pay him $10,000, and of that sum she paid about half in installments, and gave him her promissory note for the balance. This nefarious transaction never came under the scrutiny of whatever probate or surrogate court had charge of the testator's estate. When the unfaithful executor died, an action by his legal representatives was begun to recover on the unpaid balance of the note. The maker resisted and cross claimed for the amounts she had already paid. The court declined to give affirmative judgment for either litigant. Not the slightest inference can be drawn from that case that the courts of New Jersey would be any more tolerant of the misconduct of an unfaithful court official than the other eminent tribunals from whose decisions we have quoted.

The judgment is affirmed.