No. 34,171

NATIONAL MUTUAL CASUALTY COMPANY, *Appellee*, v. CHARLES F. HOBBS, as Commissioner of Insurance, *Appellant*.

(88 P. 2d 1006)

Opinion filed April 8, 1939.

*Clarence V. Beck*, attorney general, and *C. Glenn Morris*, assistant attorney general, for the appellant.

*Hugh T. Fisher, Irwin Snattinger, J. J. Schenck* and *Clyde P. Schenck*, all of Topeka, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This is an appeal from a judgment of the Shawnee county district court in which mandamus was invoked to compel the commissioner of insurance to renew plaintiff's certificate of authority to do business in this state as a foreign mutual insurance corporation.

The action was begun on April 26, 1938. The renewal certificate plaintiff sought was to cover the year beginning May 1, 1938, and ending April 30, 1939. An alternative writ was issued, directed to the commissioner of insurance. The state corporation commission was impleaded and temporarily enjoined from interfering with plaintiff's business.

In its application for the writ of mandamus, plaintiff alleged that it was incorporated under the laws of Oklahoma; that on July 9, 1937, it had been granted a certificate of authority from the defendant commissioner to do business in Kansas until May 1, 1938; and that its corporate business was mainly that of casualty insurance concerning motor vehicle liability and workmen's compensation liability.

It alleged that it was in good financial and solvent condition and had a surplus of $220,000; but that on April 20, 1938, it was informed

by the defendant commissioner that a renewal of its certificate of authority to do business in Kansas on and after May 1 would not be issued; and the commissioner directed it to cease issuing its policies of casualty insurance in this state and to notify all its Kansas agents and representatives accordingly.

Plaintiff further alleged that the Kansas insurance business upon its books was of great financial value, the gross annual premium income of which was more than $200,000, and that the denial of a renewal of its certificate of authority would cause plaintiff irreparable loss and damage.

Plaintiff further alleged that the refusal of the defendant commissioner to renew its certificate of authority was unreasonable, arbitrary and discriminatory.

In his answer and return of the alternative writ, the defendant commissioner denied generally the allegations of plaintiff's application but admitted its corporate existence. He pleaded his official supervisory authority over corporations doing or seeking to do business in this state, and that his official discretion in issuing or withholding annual certificates of authority to transact insurance business was not controllable by mandamus.

The commissioner of insurance further answered that he had denied plaintiff's demand for a renewal of its certificate of authority because he was convinced that plaintiff then was and theretofore had been doing business in violation of its charter, its bylaws, and the laws of Oklahoma and Kansas; that defendant was not possessed of the requisite admitted assets required by the laws of these two states; and that on July 9, 1937, defendant had perpetrated a fraud on the insurance department of this state by falsely representing to defendant that it had complied with defendant's orders to cease and desist from certain unlawful and improvident practices to which he had objected.

The answer to the alternative writ also pleaded at length certain complicated arrangements between plaintiff and a business trust of Tulsa, Okla., called the Insurance Service Company, of which its president and vice-president were likewise president and vice-president of the plaintiff company, whereby the Insurance Service Company, on or prior to May 2, 1937, had contributed to plaintiff $33,000, and on May 24, 1937, the Insurance Service Company had ordered that a "surplus certificate" for $33,000 be delivered to plaintiff, and

on July 3, 1937, it contributed to plaintiff a further sum of $20,000 in the form of a "surplus certificate."

Answering further, the commissioner alleged that in 1937, at the time plaintiff applied for a certificate of authority to do business in Kansas, there was in existence between plaintiff and the Insurance Service Company a contract wherein the board of directors of plaintiff company had divested itself of all authority over its corporate affairs and had granted to the Insurance Service Company the general management of its business, including the keeping of its books and records, and the issuance, sale and delivery of its policies, and—

"That the defendant commissioner of insurance of Kansas, before admission of said National Mutual Casualty Company, required that said management contract be canceled as a condition to the granting to said company of a certificate of authority to do business in the state of Kansas, which contract was abrogated, set aside and canceled on the 30th day of June, 1937."

Defendant further alleged that disregarding that condition on which (with others) he had granted plaintiff a certificate of authority, plaintiff, in evasion of defendant's requirement as narrated above, on September 1, 1937, made another contract with the Insurance Service Company not materially different from the one whose abrogation he had required as a condition precedent to his granting of authority to it to do business in this state. One of the terms of the latter agreement provided that the Insurance Service Company should have a commission of twenty percent on all business written by it since June 30, 1937, and another five percent commission as a consideration for performing the regular corporate duties of plaintiff which the Insurance Service Company undertook to do in its stead. Defendant alleged that these contractual arrangements were *ultra vires*, and were made to evade the requirement under which defendant had licensed plaintiff to do business in Kansas, in the certificate of authority he had issued to it on July 9, 1937.

Defendant further alleged that on March 28, 1938, the Insurance Service Company entered into a contract with a reciprocal insurance concern of Waco, Tex., entitled the Republic Underwriters, whose certificate of authority to do an insurance business in Kansas was suspended on March 22, 1938. By that contract the Insurance Service Company took over the Kansas business of the Republic Underwriters, the annual gross premiums of which were about $183,-000, which business in turn was taken over by this plaintiff, but the management of which was controlled by the Insurance Service Company by the terms of the contract of September 1, 1937, which had

been made in evasion of the requirement of defendant as a condition of the granting of authority to plaintiff to do business in Kansas, dated July 9, 1937.

Defendant's answer further narrated at much length many irregular and unauthorized acts and practices of plaintiff and the Insurance Service Company to hold the business they had acquired from Republic Underwriters, needless to set down here in detail. Defendant alleged that the principal motive for the asssumption of that business was for the personal gain of the president and vice-president of the Insurance Service Company, who were likewise the president and vice-president of the plaintiff company.

Defendant further alleged that plaintiff's annual statement of December 31, 1937, did not comply with the provisions of the statutes governing the same. The alleged defects and shortcomings of such annual statement were pleaded at great length, as well as the alleged dilatory and inadequate responses and explanations of plaintiff touching defendant's pertinent inquiries prompted by such annual statement.

The insurance commissioner's answer further alleged that plaintiff did not have the admitted assets required by the state of its domicile, Oklahoma, and alleged that such assets were insufficient to meet its liabilities and to provide the minimum surplus fund required by statute to authorize it to do business in Kansas as a foreign mutual insurance company. Defendant pleaded specific provisions of Oklahoma statutes pertinent to the issues, and alleged that the claimed total of plaintiff's admitted assets of $556,811.96, and admitted liabilities of $337,857.13, which left an apparent surplus of $218,754.83, was not correct; that such pretended surplus was padded by a mere book entry of $98,000, whose only basis was plaintiff's contention that in its purchase of a seven-story office building in Tulsa for $152,000 it had made a clear profit of $98,000, which was properly allowable as part of its surplus. Defendant alleged that the investment itself was unauthorized under Oklahoma insurance statutory regulations, and that the claimed profit was nonexistent and not a proper asset to be claimed in determining the surplus of the company.

Another item claimed by plaintiff as part of its admitted assets, and which was included in making up its claimed surplus, was one for $56,000, which represented its estimated earned premiums on workmen's compensation insurance policies, the exact amount of

which could not be ascertained until its policy-holding employers' pay rolls could be audited and the amounts due could be collected. Defendant claimed that this estimated item was not properly chargeable as admitted assets nor proper to be counted as part of plaintiff's required surplus.

Yet another item claimed by plaintiff as admitted assets was one for $38,211.27, which represented commissions paid to plaintiff's agents on advance premium deposits. Plaintiff's claim to this sum as an admitted asset and as part of its lawful surplus was denied by defendant. Defendant alleged that these three challenged items—$98,000, $56,000 and $38,211.27 (totaling $192,211.27)—could not properly be counted as admitted assets of plaintiff; and in consequence the actual amount of such assets was only $364,600.69, and as the admitted liabilities were $337,857.13, plaintiff's net surplus could be no more than $26,743.56.

Defendant further alleged that by Oklahoma statutory regulations, plaintiff was required to invest 75 percent of its admitted assets in certain specified securities, which did not include either of the three items above mentioned, and that only 25 percent of such assets could be otherwise invested; and even in the latter case, the consent of the Oklahoma insurance commissioner would be required. Defendant alleged that based on those statutory regulations—

"Said company could invest $55,527.44 in the type of investment other than specified in the first eight sections of said law, and other than the said $166,582.32 is so invested. As a result thereof, by reason of said improper investments of said company, the total amount of assets that can be admitted as proper investments under the laws of Oklahoma is $222,109.76. That said company has admitted assets of $222,109.76 under the requirements and conditions of the Oklahoma laws under which said plaintiff company operates, and liabilities according to said annual statement of $337,857.13, and by the admissions and agreement of the officers of plaintiff company, said liabilities should be $408,208.19, when said liabilities are properly set up on the convention form of annual statement as required by the laws of Kansas. That as a result thereof, said plaintiff company shows an impairment of $186,098.43, which said sum represents the excess of liabilities over assets that are properly admittable as assets of said company."

Defendant concluded his answer and return with an allegation that plaintiff's admitted assets, when properly ascertained, did not reveal the requisite $50,000 surplus to entitle it to a certificate of authority to transact business in Kansas.

On the issues thus defined the cause was tried. The evidence covered a wide range. The oral testimony as abstracted extends to

100 closely printed pages; the documentary exhibits extend to 50 pages more. The latter include extracts of Oklahoma law, plaintiff's articles of incorporation and bylaws, its contracts with the Insurance Service Company, its còntract of purchase of the business of Republic Underwriters, telegrams and controversial correspondence between plaintiff's officials and the defendant and his officials concerning certain features of plaintiff's statements and scheduled reports of December 31, 1937, and April 30, 1938, which apparently did not conform to the accounting system prescribed by some semiofficial group of state departments of insurance in which defendant participated, and about certain obscurities in those reports and in certain supplementary data prepared by plaintiff at the request or direction of defendant. Other documentary exhibits tended to show that the officials of the Oklahoma department of insurance did not share defendant's misgivings touching the legality of the investments or financial solvency of the plaintiff company. Based upon those reports and information, and on the tabulated analyses defendant had drawn therefrom, and also upon defendant's construction of Oklahoma statutory and departmental regulations governing permissible investments, admittable assets, investments made in violation of those regulations resulting in nonadmittable assets, those tabulated analyses (defendant's exhibits Nos. 45 and 46) as interpreted by defendant revealed no surplus whatever, but only a quite sizable deficit.

The acquisition of the ten-year-old, seven-story office building in Tulsa, Okla., elicited much controversial opinion evidence on two points—whether the plaintiff's funds were lawfully invested in the building, and whether it was proper to put a valuation of $250,000 on the building when it had cost but $152,000.

Opinion evidence also developed a sharp controversy over the propriety of including as admitted assets certain prospective moneys plaintiff had not yet laid its hands on, calculated on the estimated amount of earned premiums on employers' liability insurance policies which would probably be paid by those policyholders as soon as their books and records were audited and the exact amounts ascertained. The estimated amount of this asset in prospect, which was claimed by plaintiff as proper to be admitted, was $56,000. By the time this lawsuit was tried, some three months later, the amount actually collected under this head was $65,745.83.

Another asset plaintiff claimed to be admissible, and which de-

veloped a contrariety of actuarial and accounting opinion, was one for $38,211.27, predicated on certain commissions plaintiff had advanced to its agents returnable when they had consummated sales of the company's policies of insurance and the premiums thereon had been paid. The trial court sustained the defendant commissioner's contention that this item was not allowable as an admitted asset, and as there is no cross-appeal on that ruling we will not be further concerned with it.

As the protracted trial came to a close, the court concluded that the controversy centered largely upon two points—the value of the office building in Tulsa, and the propriety of plaintiff's claim that the item of $56,000 on its estimate of the amount of earned, but uncollected premiums, should be regarded as admitted assets of the company. On both these controverted points the trial court held with plaintiff and against the commissioner. Its opinion, which contains its informal findings of fact and conclusions of law, reads:

" 'I have come to the conclusion that the plaintiff has proven by a preponderance of the evidence that it is in a solvent condition.

" 'In considering this case, I have been confronted with rather an unusual situation, insofar as the evidence is concerned. On behalf of the plaintiff, all of the records required of the plaintiff were introduced in evidence, as well as the evidence of a large number of witnesses who are not only familiar with the condition of the company, but who are also familiar with the laws of the state of Oklahoma. I am also confronted with the situation that of the eleven states in which this company is doing business, the state of Kansas is the only state which has raised any question as to the solvency of this company. As against this evidence of the plaintiff, I have only the testimony of the actuary of the Insurance Department of the state of Kansas, and to a very great extent each answer as given by him in his evidence was prefaced by the remark that his answer was based upon his interpretation of the laws of the state of Oklahoma. As against his evidence, I have the evidence of the secretary of the Oklahoma Insurance Board, of the examiner of that office, and of an attorney of more than thirty years experience in practicing law in Oklahoma, all of whose evidence as to the interpretation of the insurance laws of the state of Oklahoma are contrary to the interpretation placed upon such laws by the actuary of our state insurance commissioner's office.

" 'It appears to me that the difficulties between the insurance commissioner and the company border very closely upon being of a personal nature, and more a question of what should be considered sound bookkeeping or unsound bookkeeping and the question of the allocation of certain assets which might be admittable or not admittable.

" 'The first item to which any serious objection was made was the reference to the building, and it is my opinion that by far the greater weight of evidence introduced in this case showed that the building was properly valued as an

asset, taking into consideration all of the evidence as to value, and that when the state insurance commissioner arbitrarily disregarded everything shown him in connection with the value of the building except the purchase price of the building, he acted unreasonably. I am certain that had this company paid a greater price for the building than the independent evidence from disinterested witnesses showed it to be worth, the insurance commissioner would have been justified in demanding that the valuation on the building should be depreciated to meet its actual value, and not be valued arbitrarily upon the purchase price only. Feeling as I do that this is the rule, certainly the converse of the rule should be true also.

" 'As to the item of unreported premiums, amounting to $56,000, which the insurance commissioner claims should not be admitted as an asset, the proof shows that in estimating this asset, the company was very conservative, because when all of these premiums were actually reported, they amounted to more than $67,000. I am inclined to agree with the insurance commissioner on the $38,000 item, and do not think that it should be admitted as an asset. Disallowing the $38,000 item, and allowing the other two items, it is my opinion that the evidence shows that this company is in a sound financial condition.

" 'I feel that it is the duty of the insurance commissioner to not only be fair to the policyholders of insurance companies, but also to the companies themselves, and feeling as I do that to a large degree personalities were permitted to enter into the dispute between this company and the insurance commissioner's office, I am of the opinion that if there is any misunderstanding between these gentlemen, if all prejudice is laid aside they can iron out their difficulties with ease.

" 'In view of the foregoing, I am of the opinion that judgment should be rendered for the plaintiff as prayed for in its petition. This judgment will be entered as of Monday, August 1, 1938.'

"It is therefore ordered, adjudged and decreed by the court, That the defendant, Charles F. Hobbs, commissioner of insurance, be and he hereby is ordered and directed to issue to the plaintiff a certificate of authority to do business in Kansas as of May 1, 1938, and for costs.

PAUL H. HEINZ, *Judge.*"

The commissioner of insurance brings the cause here for review, with the usual specifications of error which may be summarized into two—the unauthorized substitution of the trial court's judgment on a matter exclusively vested by statute in the discretion of the commissioner of insurance, and that there was no substantial basis for the court's finding that defendant had acted arbitrarily, unreasonably or unfairly towards plaintiff, or had permitted personalities, prejudices or misunderstandings to enter into the exercise of his opinion and decision that plaintiff's certificate of authority to do business should not be renewed for the year beginning May 1, 1938, and ending April 30, 1939.

In determining the propriety of a judgment in mandamus against

a state officer directing him to perform some official duty, the district court and this court must constantly keep in mind the narrow scope of our jurisdiction in respect to matters of that sort. We may not substitute our judgment for his judgment, and must allow a rather wide range for the exercise of his discretion. Indeed, the ordinary rule is that it is only where a state officer's executive or administrative discretion has been abused or where there has been a failure or refusal to perform an official duty that the courts are authorized to interfere. This principle of state policy has been discussed frequently by this court. (*State, ex rel., v. Mohler,* 98 Kan. 465, 471-2, 158 Pac. 408; *Jackman v. Public Service Commission,* 121 Kan. 141, 245 Pac. 1047; *National Savings Life Ins. Co. v. Hobbs,* 129 Kan. 663, 33 P. 2d 135; *State, ex rel., v. Kansas City Life Ins. Co.,* 140 Kan. 267, 36 P. 2d 88.)

In *Wright v. Federal Reserve Life Ins. Co.,* 131 Kan. 601, 292 Pac. 945, whereby litigants sought judicial interference with the corporate concerns of an insurance company, this court said:

"The law presumes that a public officer will do his duty, and therefore this court is bound to deal with the legal question before us with the presumption that the commissioner of insurance is faithfully discharging his official duty with reference to the alleged delinquencies of the defendant company.    . . .

"The bench and bar are aware how greatly the state's legitimate powers of supervision and visitation have been extended over business enterprises in the last decade or two, especially those kinds of business which are public or quasipublic in their nature. . . . (Citations.)

"Contemporaneous with the expansion of governmental power over corporate business and the imposition of important duties on the state's own officials in relation thereto, a tendency to limit officious meddling on the part of others in their affairs may also be noted: (Citations)." (pp. 605, 607, 608.)

The statutory powers conferred on the commissioner of insurance are necessarily broad and comprehensive. It is a well-known historical fact that in bygone years the people of this state suffered many evils at the hands of unsound and ill-managed insurance companies; and the pertinent legislation dealing with that evil has been a progressive and continuous expansion of the state's supervisory authority over insurance companies which eventually culminated in the enactment of the insurance code of 1927. (G. S. 1935, 40-101 *et seq.*) Indeed, the supervisory powers of the commissioner of insurance have been considerably increased since that enactment, as even a casual examination of our later successive compilations of session laws will reveal.

634

In the informal opinion and findings of the trial court it is first said:

"I have come to the conclusion that the plaintiff has proven by a preponderance of the evidence that it is in a solvent condition."

If this were an ordinary lawsuit between private litigants, where the mere question of plaintiff's solvency was a controlling one, an appellate court would be bound by the trial court's finding of fact based upon the oral testimony of witnesses. In this case, however, the fact that the trial court gave full credence to plaintiff's evidence, while the commissioner of insurance gave it little or none, would not justify the trial court's supersession of the commissioner's official responsibilities with its writ of mandamus. The matter of valuation of plaintiff's office building in Tulsa is a good illustration of the point we are discussing. If the true valuation of that building were a simple question of disputed fact we might have to concede that the trial court's finding based upon disputed oral testimony established a proper valuation of the building to be $250,000 as claimed by plaintiff. But the refusal of the commissioner of insurance to sanction such a valuation or any valuation greater than its purchase price, $152,000, did not justify the trial court's conclusion that defendant's attitude on that matter was arbitrary and unreasonable. Aside from the very serious legal question whether the purchase of the building was proper under the provisions of the Oklahoma Insurance Code (and some of the justices of this court would not hesitate to say that it was not), the fact that the Oklahoma Insurance Board only gave the investment its countenance upon condition that plaintiff's valuation of $250,000 of it should be reduced ten percent per annum until its valuation would coincide with the actual cost of the building was a potent circumstance which the defendant could not ignore without drawing in question his alertness and zeal to see that only insurance corporations of unquestionable financial soundness are permitted to do business in this state.

The second of the larger items relied on by plaintiff to make up its requisite surplus to entitle it to a license to do business in Kansas—the estimated $56,000 which plaintiff anticipated it would collect after the proper audits had been made and the exact amounts due from its policyholders had been ascertained—is another instance of the wisdom and propriety of our law which leaves the significance of such matters to the commissioner of insurance, and not to the court. While it did appear by the time of the trial that somewhat

more than $56,000 had actually been collected from the anticipated source, it is nothing unusual to be wise after the event. It could not have been known when defendant rejected the anticipated sum as an admitted asset that such a sum would actually be collected. Certainly the commissioner's attitude in respect to this item of $56,-000 as an admitted asset was not a justifiable basis for the finding that defendant's refusal to issue his certificate of authority, as of May 1, 1938, was unreasonable, arbitrary and discriminatory. Nor did it furnish a tenable basis for issuing the writ prayed for by plaintiff. (*Murphy v. Hobbs,* 139 Kan. 799, 33 P. 2d 135.)

This court holds that there was no abuse of official discretion on the part of the commissioner of insurance in refusing to consider plaintiff's claimed profit of $98,000 on its investment in the Tulsa building as an admitted asset, nor in rejecting plaintiff's estimate of anticipated collections of $56,000 as an admitted asset at the time he ruled on these matters, on or before the date this action was begun, April 26, 1938. Without these two items plaintiff did not have the requisite surplus of $50,000 required of a foreign mutual insurance company to entitle it to a certificate of authority to transact its insurance business in Kansas (G. S. 1935, 40-1103, 40-1104).

These conclusions render it unnecessary to consider other matters which doubtless entered into the deliberations of the commissioner of insurance in reaching his determination to refuse to renew plaintiff's certificate of authority as of May 1, 1938, which would necessarily include the challenged conduct of plaintiff in the manner it took over the business of the Republic Underwriters without conforming to the statutory provisions governing that subject (G. S. 1935, 40-221).

Elaborate tables of figures are set out in the abstract on the assumption that this court can study and make a critical analysis of them, which might lead us to draw our own conclusions touching the financial soundness of the plaintiff company. This court does not perform the functions of an expert accountant. (*Allen County Comm'rs v. Board of Education,* 142 Kan. 770, 772, 51 P. 2d 973; *Webster v. Toland,* 148 Kan. 36, 40, 79 P. 2d 884.)

The judgment of the district court is reversed and the cause remanded with instructions to enter judgment for defendant.