No. 34,992

ELMA E. BAYLESS, ELSIE M. CRESSLER, and JEANNE LOUISE BAYLESS and SUZANNE FRANCES BAYLESS, Minors, by C. C. BAYLESS, Their Next Friend, *Appellants*, v. THE WHEELER-KELLY-HAGNY TRUST COMPANY, *Appellee*.

(109 P. 2d 108)

Opinion filed January 25, 1941.

*Claude I. Depew, W. E. Stanley, Lawrence Weigand, William C. Hook, Sidney J. Brick* and *Lawrence E. Curfman,* all of Wichita, for the appellants.

*B. F. Alford,* of Wichita, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This was an action for breach of trust and for an accounting and restitution of funds alleged to have been improperly invested.

Plaintiffs, who are the beneficiaries of the trust, alleged in their petition that on April 8, 1926, one C. C. Bayless and Elma E. Bayless, his wife, entered into a trust agreement with the defendant company whereby the latter received in trust and agreed to manage and invest and reinvest a large amount of personal property consisting of bonds, mortgages, notes, corporate stock and cash, of the aggregate value of $153,853, and to collect and distribute the income thereof from time to time to Elsie M. Cressler and Elma E. Bayless, mother and daughter, share and share alike, and later to the two children of Elma E. Bayless on the deaths of their mother and grandmother. The trust was to endure until Elma's children should attain the ages of 25 and 45 years respectively, subject to conditions of no present concern.

The trust agreement was exhibited as part of plaintiffs' petition. By its terms defendant was authorized—

"To purchase or substitute any such securities, for those held, issued, owned or controlled by the trustee individually, provided that no such securities shall be sold to the trust at any profit to the trustee, and after paying all proper taxes, assessments and necessary expenses, and the charges and compensation of the trustee which shall not exceed five percent of the income of the property placed in trust, to make such disposition of the trust fund and estate as is provided and set forth herein."

The trust agreement also provided—

"That the trustee shall not charge as expenses of the trust any overhead expenses of the trustee, nor compensation to any of its officers or employees, nor any expense attendant upon the investment, collection or handling of moneys, property or securities into which the trust property by this instrument conveyed may be turned or converted by the trustee, nor shall any commissions or compensation be charged or retained by the trustee itself other than the specific compensation based on the percentage of the income as hereinafter specified."

By the trust agreement the trustee was obligated to keep full and complete accounts of the property and securities of the trust estate, and of its collections and disbursements; the records were to be open to inspection of the grantors and beneficiaries; and semiannual statements were to be rendered to the grantors while they lived and thereafter to the beneficiaries. The trust agreement provided that as compensation for its services—

"The trustee shall be allowed and may retain out of the income as received and collected, in full compensation for its service in performing this trust five percent of the income of the property held in trust."

Plaintiffs alleged that defendant had breached the terms of the trust agreement in various specified particulars, viz.: that defendant had sold its own securities to the trust at a profit; that defendant had failed to account for all income, proceeds, profits and revenues of the trust estate; that defendant had charged against the trust estate certain overhead expenses of the trustee, including compensation of its officers and employees and other expenses attendant upon the handling of money, property and securities of the trust estate; that it had charged commissions and compensation other than that specified in the trust agreement, and had made improper and unauthorized investment of the trust funds; that it had failed to keep full and accurate accounts showing the condition of the trust estate and of the property and securities held in its behalf; and that after proper request defendant had failed to furnish plaintiffs with accurate information concerning the trust property and the collections and disbursements pertaining thereto, and had failed to furnish semiannual written statements to the grantors of the trust.

Plaintiffs prayed that defendant be required to replace in the trust all funds improperly invested by it in violation of the trust agreement; that all amounts improperly charged against the trust be restored to the trust estate, to wit, expenses, compensation, commissions and profits not chargeable to the trust; and that defendant resign as trustee after making full accounting and restitution. Plaintiffs also prayed for legal and equitable relief in respect to all matters in which defendant had been derelict as alleged, and for removal of the trustee and an appointment of its successor, and for other appropriate relief.

To this petition defendant filed an answer containing a general denial, an admission of the execution of the trust agreement, and its acceptance of the trust estate. Answering further, defendant alleged that the trust agreement was indefinite in its language where it provided that no securities owned by the trustee "shall be sold to the trust at any profit to the trustee," and to clarify that language, about two months after the creation of the trust, C. C. Bayless, one of the grantors of the trust, authorized his attorney to confer with the attorney for the defendant trustee, and that they prepared a written interpretation and clarification for Bayless to sign; and that Bayless signed it about June 16, 1926, and that the original instrument so signed had been lost, but defendant attached to its answer what it alleged was a true copy of a carbon copy of the original instrument marked exhibit "A."

The answer further alleged that the cost of the securities it had sold to the trust sometimes exceeded the market value thereof, and that defendant had always furnished plaintiffs with timely reports of the status and operation of the trust and of its assets, receipts and disbursements. The answer concluded with a prayer for judgment in defendant's behalf, and for an allowance for its unusual costs and attorneys' fees necessitated by this litigation, and defendant also prayed that it be permitted to resign as trustee and that the court appoint its successor.

Exhibit "A" attached to defendant's answer reads:

"The undersigned, C. C. Bayless, does hereby certify, state and declare:

"That he is grantor in two declarations of trust as entered into on the 8th day of April, 1926, by and between the undersigned and wife as grantors and the Wheeler-Kelly-Hagny Trust Company as trustee; and that such trust was originated and created and covered the property of the undersigned, and the preparation of the instruments evidencing the same was supervised by him, and the clause in paragraph —, page — of such instruments which states 'provided that no such securities shall be sold to the trust at any profit to the trustee' meant and was intended to state that none of the securities as held, issued, owned or controlled by the trustee individually should be sold to the trust for more than market value of the same and that no profit should be realized by the trustee in the sale of its own securities to the trust over and above the market value of such securities; and that this construction is at this time placed upon such clause in the trust instruments by the undersigned, as the maker of the trust, in order to avoid any misunderstanding in the future as to the construction of such clause.

"In witness whereof, the undersigned has hereunto set his hand at Wichita, Kansas, this—day of June, 1926.

In the presence of and witnessed by:
_____"

Plaintiff filed a motion to strike out certain parts of the answer, which was sustained in part and overruled in part—following which plaintiff filed a reply denying that C. C. Bayless had ever signed any instrument of the form or content of exhibit "A" and denied that he had any authority to do so.

On these issues the cause was tried by the court without a jury. On the assumption that the original trust agreement was indefinite in its language which provided "that no . . . securities shall be sold to the trust at any profit to the trustee," evidence was introduced showing that its terms had been written after tentative drafts had been formulated and revised by counsel for the grantors and the trustee. Touching exhibit "A," C. C. Bayless testified that he had

never signed any instrument of its purport. Defendant adduced evidence to show that exhibit "A" was a true copy of a carbon copy belatedly discovered in its files; that a diligent search had been made for the original instrument without avail. A witness for defendant testified to the circumstances leading up to the drafting of the original instrument, exhibit "A"—that soon after defendant had accepted the trust it became his duty as trust officer of defendant to invest some money belonging to the trust estate and that he had examined the trust agreement and discovered what he considered an. indefiniteness in its terms, and that the original of exhibit "A" had been drafted to clarify them. A witness for defendant testified that while he had not seen Bayless sign the original of exhibit "A" he was morally certain that Bayless had done so.

Touching the particular investments made by defendant in behalf of the trust estate, the business practice of defendant was explained to the trial court at length. In brief, as illustrative thereof, it was shown that when defendant would undertake to finance or float a proposed bond issue for a corporation engaged or proposing to engage in a hotel business, or an amusement business, or some farming or building enterprise, defendant would buy the entire bond issue at par or other agreed price, upon condition that the corporation issuing the bonds pay to defendant some specified rate or amount of commission. Thus for the Catarina Farms Company, defendant financed a bond issue of $1,000,000 for a commission of $25,000; for the Interstate Amusement Company it financed a bond issue of $475,000 for a commission of $20,000. Other corporate loans were financed on similar terms. It was also shown and admitted that some bonds of these corporate issues were sold by the trustee to the trust estate at prices which did not take into account the very substantial commissions exacted by the trustee for its financing services. Furthermore, in fixing a cost price to be charged to the trust estate for portions of these bond issues, it was defendant's practice to make an estimate—what it called an adjustment—of the costs of acquiring the bond issue, and such costs were apportioned to and charged as part of the price at which such bonds were sold to the trust estate.

Of some minor importance in this lawsuit was the fact adduced by the litigants that about two years after the creation of the trust a lawsuit had been arranged at the instance of Elsie M. Cressler, widow of the founder of the family fortune, to have her rights in

this trust estate definitely adjudicated. That lawsuit was adjudicated to a conclusion defining and confirming Mrs. Cressler's beneficial interest in the trust estate, but no intimation of the existence of such an instrument as exhibit "A" appeared in that lawsuit.

At the conclusion of the evidence plaintiffs and defendant submitted to the court proposed findings of fact. The court, however, chose to make its own; but only their controversial features need be stated here. The court found that shortly after the trust was created, defendant's trust officer consulted the trust agreement to ascertain how he should invest $1,000 belonging to the trust estate; that he was uncertain about the meaning of the proviso "that no such securities shall be sold to the trust at any profit to the trustee"; that he took up the matter with the trust company's attorney and that the latter and the attorney for C. C. Bayless drew up a supplemental instrument—the original of exhibit "A"—which declared that the questioned language was intended to mean—

"That none of the securities as held, issued, owned or controlled by the trustee individually should be sold to the trust for more than the market value of the same and that no profit should be realized by the trustee in the sale of its own securities to the trust over and above the market value of such securities";

The court further found that the original of Exhibit "A" had been lost; that diligent search had been made for it without avail, and—

"From the testimony as introduced by disinterested witnesses, and all the circumstances surrounding the transaction, the court finds that this supplemental agreement which was known as defendant's exhibit 'G' (also as exhibit 'A') was in fact prepared and executed as a part of the original trust agreement and in construction thereof."

Touching the character of the investments made by defendant in behalf of the trust estate, the trial court found—

"At that time they were securities generally sold on the market producing a good rate of income and at the time when prosperity was general. No complaint was made as to the securities but it was only long after subsequent events showed that some of them had become unproducing or of small value while others remained fairly good producing investments and of reasonable value.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The trust company has carried out the terms of the trust in the supplemental agreement, . . . its purchases have been at the then market value of the securities in question without the realization by the trustee of any profit in the sale of its own securities to the trust over and above the market value of such securities."

The trial court made three conclusions of law:

"1. Defendant has not violated the terms of the trust.

"2. Plaintiffs are not entitled to an accounting nor to recover more than the amount actually due under the transactions.

"3. Costs of the case should be assessed against the plaintiff."

The trial court ruled that in view of its findings and conclusions all other requested findings would serve no purpose, and judgment was entered in favor of defendant.

Plaintiffs appeal, assigning various errors. They first contend that the agreement of April 8, 1926, was not ambiguous, nor in need of clarification by an alleged supplementary agreement of the tenor of exhibit "A"; that the trust was irrevocable; that it could not be modified nor authoritatively interpreted by the assent or signature of one of the two grantors of the trust estate; nor did such supplementary agreement, if made, bind the beneficiaries of the trust.

In our statement of the case we have set out the language of the trust agreement. It is difficult, we think, to discover any indefiniteness or ambiguity in the quoted text of it. As plainly and specifically as words could make it, the declaration of trust provided that no securities belonging to or controlled by the trustee could be sold to the trust estate "at any profit to the trustee." One compensation, and one alone, was to be allowed to the trustee for its services in managing, investing, reinvesting, safely keeping the trust property, and for disbursing the net income thereof to the beneficiaries. That compensation was not to exceed five percent of the income of the trust—the exact language of the trust agreement providing that "the charges and compensation of the trustee . . . shall not exceed five percent of the income of the property placed in trust . . ."

To make assurance doubly sure that such limitation of compensation for defendant's services should not be evaded by sophistical interpretations, the trust agreement declared that—

"The trustee shall not charge as expenses of the trust any overhead expenses of the trustee, nor compensation to any of its officers or employees, nor any expense attendant upon the investment, collection or handling of moneys, property or securities into which the trust property by this instrument conveyed may be turned or converted by the trustee, . . ."

The ordinary rule for the construction of written instruments applies to declarations of trust. Where their text is plain and unambiguous there is nothing to construe. In *Central Union Trust*

*Co. v. Trimble,* 255 N. Y. 88, 93, 174 N. E. 72, the action was to construe a trust agreement. It was there said:

"Processes of construction may not be resorted to for the purpose of reading into the trust deed an intention not expressed or legitimately to be implied from the language used when construed in the light of the surrounding circumstances. We are to search, not for the probable intention of the settlor merely, but for the intention which the trust deed itself, either expressly or by implication, declares. We are to ascertain the intention from the words used and give effect to the legal consequences of that intention when ascertained."

In 26 R. C. L. 1254, 1256, it is said:

"If the language of the instrument is unambiguous and perfectly clear, there is no field for construction.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"In construing an instrument creating a trust the usual rules as to the admissibility of extrinsic evidence to affect writings apply, and where the instrument is free from ambiguity, and there is no imperfection or inaccuracy in its language, the donor's intention is to be collected from the words used by him, and parol evidence is not allowable for the purpose of adding to or explaining or subtracting from it, or to raise an argument in favor of any particular construction."

See, also, Restatement, Trusts, sec. 38.

The rule is also fundamental that when a trust has been created and the trust *res* has been delivered to the trustee, the settlor of the trust cannot thereafter be heard to say what was intended by the trust agreement. When it is unambiguous it speaks for itself. In *Boyd v. United States,* 34 F. 2d 488, it was said:

"Where settlor by valid transfer in trust alienated his entire title to trust property .  .  . he had no right by subsequent agreement with trustee to alter terms of trust, .  .  . and such agreement was therefore void." (Headnote 3.)

In *Jones v. Nicholas,* 151 Ia. 362, 130 N. W. 125, it was said:

"The courts almost universally hold that a trust once perfectly created is irrevocable even though voluntary; and that subsequent acts of the settlor or trustee cannot affect it. (Citations.)"

In *James v. James,* 260 Mass. 19, 156 N. E. 745, where the original terms of a deed of trust made no provision for its amendment, a subsequent memorandum of agreement which purported to amend the original terms, signed by some, but not all of the persons concerned in the trust, the Supreme Judicial Court said:

"It is settled in this commonwealth that a 'voluntary and fully executed settlement cannot be revoked or altered in the absence of any provision in the instrument reserving such power.' (Citations.) Upon the facts found, the

proposed amendment was not assented to by all parties interested in the trust. and never became effective to modify or change the terms of the trust instrument . . ." (p. 22.)

In 26 R. C. L. 1229, it is said:

"It is equally well settled that no declarations of a former owner of the property, made after he had parted with his interest therein, can be received in evidence to effect [affect] the legal or equitable title to the premises. These rules are applicable to resulting trusts."

In 1 Bogert on Trusts and Trustees, sec. 42, it is said:

"Ordinarily the settlor of a trust in which the fee or absolute interest is granted has no interest in the trust property after the complete creation of the trust. He is as much a stranger to that property as a third person who has had no connection with it. The legal title to the property is in the trustee, and the equitable interest rests in the beneficiary."

Still more obviously, we think, does the rule just stated apply where, as here, there were two settlors of the trust estate. There is no pretense that Mrs. Elma E. Bayless, one of the grantors of this trust, gave her assent to any modification of the terms of the original trust agreement, by the so-called supplementary agreement, exhibit "A," signed by Bayless. Most important of all; however, was the fact that the beneficiaries of the trust, the plaintiffs herein, never assented to any purported agreement of the tenor of exhibit "A." In this view of the case, it is immaterial whether C. C. Bayless signed it or not. This court holds that the rights of plaintiffs to the rights and liabilities of defendant were governed exclusively by the trust agreement of April 8, 1926, and were not modified, enlarged by interpretation, or otherwise affected, by exhibit "A."

This conclusion brings us to the question whether defendant did sell its own securities to the trust estate at a profit; and also to the related question whether "any overhead expenses of the trustee" or "compensation to any of its officers or employees," or "any expense attendant upon the investment, collection or handling of moneys, property or securities" were charged or retained by the trustee "other than the specific compensation based on the percentage of the income as hereinafter specified," to wit, five percent.

Touching the principal securities owned by defendant, proportions of which are sold to the trust estate at prices above cost, and as to which certain "adjustment" expenses of overhead, etc., were included in the price charged by defendant when it sold them to the trust estate, the bare facts are scarcely in dispute:

In financing a $1,000,000 bond issue for the Catarina Farms Com-

pany, defendant received commissions aggregating $81,700, and incurred expenses for traveling, printing bonds and attorneys' fees in an aggregate amount of $6,181.15, leaving a total net commission or profit of $75,518.85. It sold $6,000 worth of this bond issue to the trust estate for $5,995—at $5 less than par.

In financing a $215,000 bond issue for the Criterion Building Company, defendant received a commission of $15,000; total expenses, $1,525; net commission or profit, $13,475. It sold $16,000 of this issue to the trust for $15,980—at $20 less than par.

El Jardin Hotel issue, $250,000; net commission or profit after deducting all expenses, $11,989. Sold $3,500 of this issue to the trust for $3,482.50—at $17.50 less than par.

Interstate Amusement Company, two issues, $1,475,000; net commissions or profit after deducting all expenses, $25,450. Sold $6,500 of these issues to trust at par.

Hoblitzell Investment Company, two issues, $975,000; net commissions or profit after deducting expenses, $25,375. Sold $10,000 of these issues to trust at par.

San Antonio Suburban Irrigated Farms Company, amount of issue not shown; net commission or profit, $4,714.97. Sold $7,500 of this issue to trust at par.

Texan Hotel Company, issue, $85,000; commission note for $8,500 received for financing services which cost defendant $1,176.11, leaving nominal commission or profit of $7,323.89. Sold $7,000 of this issue to trust at par.

Osage Building Company, issue $45,000; net commission or profit $2,642.24. Sold $23,000 of this issue to trust at par.

Considering the securities just mentioned, how they were acquired by defendant, and the generous commissions it received for handling them, can it be fairly said that the several amounts of these issues sold by defendant to the trust estate at par (in three instances at a trifle less than par) were not "sold to the trust at any profit to the trustee," and that the trustee did not "charge as expense of the trust any overhead expenses" of the trustee?

We see no escape from giving a negative answer to this vital question. These securities were not sold to the trust at what they cost the trustee—far from it. Of course the defendant was entitled to its commission for financing the bond issues of the named corporations; and having acquired those issues it was privileged to sell them to the buying public at any price it could obtain—market value or

any other—and at any profit its prudent investments therein might afford. If defendant can be justified in its sales of these securities to the trust at market value and ignore the specific and repeated language of the trust agreement that they were not to be sold to the trust at any profit whatever, and that none of the overhead expenses of the defendant could be considered in calculating the price to be charged to the trust, then all the precise and specific language inserted in the trust agreement at the instance of the attorney for the grantors of the trust, as shown by the record, to prevent that very practice, goes for naught, and a trust company may with impunity make ducks and drakes of the trust estates committed to its keeping. To sanction such a practice would severely shake public confidence in the trust companies doing business in this state. The powers and practices of trust companies doing business in Kansas are governed by Kansas law, by Kansas statutes where statutes assume to govern them, and otherwise by our settled precedents which exact the highest good faith from those who assume a fiduciary responsibility for the handling of other people's money. (*Frazier v. Jeakins,* 64 Kan. 615, 618, 619, 68 Pac. 24; *Alumbaugh v. Hedges,* 125 Kan. 449, 453, 265 Pac. 50; *Hotchkiss v. Fischer,* 136 Kan. 530, 16 P. 2d 531; *Vincent v. Werner,* 140 Kan. 599, 38 P. 2d 687.) See, also, the incisive and pertinent language of one of the foremost American jurists of our time as quoted in *In re Estate of Brown,* 147 Kan. 395, 400, 76 P. 2d 857.

In the trial below it was developed and admitted that defendant had a practice of calculating its overhead and other expenses and apportioning them to its loans and adding them to the price it paid for the securities it purchased, or deducting such expenses from the commissions it received for financing such securities. A witness for defendant referred to this practice as a "sales expense" allowance. Doubtless this was quite a proper method of keeping defendant's accounts for its own information; but in fixing the prices at which it sold such securities to the trust estate defendant had bound itself in the trust agreement not to make any such charges. Defendant must be held to have made proper estimates and calculations of overhead and other expenses and for its compensation when it agreed to undertake the services of a trustee for the Bayless trust estate at the specified compensation of five percent of the net income, and not more.

The trial court's finding that none of the securities were sold to

the trust at a price "over and above [their] market value," and that the trustee did not realize "any profit in the sale of its own securities to the trust over and above the market value of such securities," was a finding which did not in the slightest degree acquit the defendant of its breaches of the trust agreement as charged in plaintiffs' petition. The restriction on the sale of defendant's securities to the trust was not that they might be sold to the trust at no profit over and above their market value, but that they could not be sold to the trust at any profit whatsoever; and the market value had nothing to do with the price, except possibly on broad questions of defendant's fair dealing in its investments in behalf of the trust estate.

In view of what has been said above, it is clear that the judgment of the district court cannot stand. As to the relief prayed for, plaintiffs ask for the application of the equitable rule founded on principle and precedent which is that where a trustee breaches its trust by making illegal investments of the trust *res* or other unauthorized disbursements of its assets, the trustee is bound to restore the trust funds on the timely demand of the beneficiaries of the trust or others authorized to act in their behalf. (Restatement, Trusts, §§ 205, 210; 2 Perry on Trusts, 7th ed., §§ 847, 851, 853; 3 Bogert on Trusts and Trustees, § 708.)

We have referred above to certain bond issues purchased by defendant and sold to the trust fund, but we have done so only to consider whether they were thus sold at a price above cost as defined in the trust agreement. Our treatment of that subject should not be regarded as a finding of fact, for that is not the function of an appellate court. (*Allen County Comm'rs v. Board of Education,* 142 Kan. 770, 772, 51 P. 2d 973; *Webster v. Toland,* 148 Kan. 36, 40, 79 P. 2d 884; *National Mutual Casualty Co. v. Hobbs,* 149 Kan. 625, 635, 88 P. 2d 1006.)

The judgment is reversed and the cause remanded for further proceedings in accordance with this opinion.